UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **KAREN JACKSON,** § | | |
| *Plaintiff*, § | CASE NO. 1:23-cv-24283-RKA | |
| § | | |
| v. § | | |
| § | | |
| **SANOFI-AVENTIS U.S. LLC, et al**, § | | |
| *Defendants*. § | | |

# PLAINTIFF KAREN JACKSON'S REPLY IN SUPPORT OF HER MOTION FOR LEAVE TO AMEND COMPLAINT

Plaintiff Karen Jackson, through her undersigned counsel, submits this Reply in Support of her Motion for Leave to Amend her Complaint, and states as follows:

**A. PERMITTING PLAINTIFF TO AMEND HER COMPLAINT TO REMOVE THE "SIX MONTH" ALLEGATION ENSURES THAT DEFENDANT'S STATUTE OF LIMITATIONS CLAIMS ARE DETERMINED BY THE ACTUAL RECORD AND ACTUAL SCIENCE REGARDING HER CELLULAR LEVEL INJURY**

Contrary to Defendants position, permitting plaintiff to amend her complaint to remove the "six month" allegation ensures that defendants' statute of limitations claims are determined by the actual record and actual science regarding her cellular level injury. Defendants seek to preclude Plaintiff from amending her complaint regarding the definition of Permanent Chemotherapy Induced Alopecia (PCIA), asserting that the same reasons that led the MDL court to reject the amendment in 2019 control this court's decision in Plaintiff's case. This is simply not true. As Defendant admits, the crux of the MDL court's concerns were that permitting the amendment would "undo" work the parties had done, specifically in the context of (a) discovery; and (b) dispositive motions then pending on bellwether cases. But those concerns are not present in this case. General discovery in this matter is complete – there is no opportunity for either of the parties

1

to "start over" the case – but, case specific discovery is just underway. Similarly, to the extent that expert reports and depositions analyze the six month, post hoc allegation identified in the Second Master Complaint – that discovery is what it is, and no one disputes that the "general discovery" emanating from the MDL court can or should be redone in light of the Plaintiff's proposed amendment. In short, the policy and case management concerns that led the MDL court to reject amendment of the PCIA definition in 2019 simply do not apply in the context of an individual Plaintiff's case after remand. Notably, Defendant's response does not muster a single concrete example of discovery that would need to be "redone" if Plaintiff were permitted to amend her complaint.

Here, Plaintiff seeks to amend the allegations regarding when PCIA manifests as an injury and when Plaintiff learned of the connection between her use of Taxotere and permanent hair loss. There is nothing "wrong" with a Plaintiff requesting the Defendant's statute of limitations defense be determined by analysis of facts in the record, rather than by the mechanistic application of a master pleading (common, not case-specific) allegation designed to facilitate pleading and discovery in multi-district litigation. The record in this case is set, and Defendant's affirmative defenses should be determined by that record. Defendant can claim no actionable prejudice from having its defenses determined by the record. Defendant's claims of prejudice are of the unactionable variety (i.e. it's desire to confuse the record or "pick and choose" the injury date depending on whether the record or the allegation is more favorable to its position).

## B. PLAINTIFF'S PROPOSED AMENDMENTS ARE NOT FUTILE

Plaintiff's amendments are not futile as she has adequately plead her fraud based claims under Federal Rule of Civil Procedure 9(b). Additionally, Plaintiff is a bit perplexed by Defendants' arguments specifically regarding futility. Defendants note that "Ms. Jackson continues to rely on generic fraud allegations." Def. Resp. P. 15. This is most likely a copy and paste attempt by Defendants to try and compare Ms. Jackson to the Plaintiff cited by Defendants in *Maxwell*[1]. Nowhere in their response do Defendants even cite to the standard for fraud in Florida[2]. The elements of fraudulent concealment in Florida are well established. To maintain a cause of action for fraudulent concealment it must be shown that the Defendant: (1) concealed or failed to disclose a material fact; (2) the Defendant knew or should have known the material fact should be disclosed; (3) the Defendant knew their concealment of or failure to disclose the material fact would induce the plaintiffs to act; (4) the Defendant had a duty to disclose the material fact; and (5) the plaintiffs detrimentally relied on the misinformation. *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015) quoting *R.J. Reynolds Tobacco Co. v. Martin*, 53 So.3d 1060, 1068 (Fla. 1st DCA 2010).

Here, Plaintiff notes in her proposed amended complaint those very facts:

- Beginning in 1998, Sanofi sponsored a trial entitled GEICAM 9805. It was initiated to compare the effects of a regimen of fluorouracil, doxorubicin, and cyclophosphamide ("FAC") with a regimen of docetaxel, doxorubicin, and cyclophosphamide ("TAC") in patients with high- risk, node-negative breast cancer. Between June 1999 and March 2003, a total of 1060 patients from 55 centers were randomly assigned to receive either TAC or FAC. By 2005, it knew that the GEICAM 9805 study demonstrated that 9.2 percent of patients who took Taxotere had persistent alopecia. Doc. 28-1 ¶ 55.

---

[1] *Maxwell v. Sanofi-Aventis U.S. LLC, et al.*, No. 2:23-cv-696-ACA, 2023 WL 7115575 (N.D. Ala. Oct. 27, 2023) (Motion to dismiss granted based on the pleadings, Plaintiff failed to argue fraudulent concealment tolled the limitations period by instead directing the Court to the MDL record in general instead of toward the pleadings.)
[2] Plaintiff does note in response to Defendants' footnote 8, that the law to be applied is that of Florida.

3

- Sanofi's Global Safety Officer, Amy Freedman, admitted that by 2006 Sanofi knew Taxotere causes permanent hair loss. Yet instead of coming clean in 2006 and revealing that Taxotere causes permanent hair loss, Sanofi created and disseminated a "comprehensive chemotherapy case kit" that included a nurse tear sheet on "hair loss", which was intended to be provided directly through chemotherapy nursing staff to consumers such as Plaintiff, that represented hair loss from Taxotere was "temporary" in nature. *Id*. at ¶ 56.
- In March 2006, Sanofi's pharmacovigilance department received an inquiry from a physician about the reversibility of alopecia following Taxotere treatment, noting that a patient had been experiencing alopecia since 2004. In response, Sanofi's Global Safety Officer for Taxotere internally acknowledged that cases of irreversible alopecia had occurred during Sanofi's clinical trials for Taxotere and that the medical literature might contain additional reports of irreversible alopecia. Despite this, Sanofi's Global Safety Officer advised against doing a literature search on the topic of irreversible alopecia and Taxotere. In addition, Sanofi withheld this information from the Taxotere label and concealed it from the medical community and consumers, including Plaintiff. *Id*. at ¶ 57.
- In December 2006, an oncologist from Denver, Colorado, Dr. Scot Sedlacek, presented a study entitled "Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer." Dr. Sedlacek tracked patients in three groups: Group A (doxorubicin regimen without a taxane); Group B (doxorubicin plus paclitaxel) and Group C (doxorubicin plus docetaxel). No women in Group A or Group B experienced persistent significant alopecia, but 6.3 percent of those in Group C did. Dr. Sedlacek concluded "that when docetaxel is administered after 4 doses of AC, there is a small but significant possibility of poor hair regrowth lasting up to 7 years. Such an emotionally devastating long term toxicity from this combination must be taken into account when deciding on adjuvant chemotherapy programs in women who likely will be cured of their breast cancer." *Id*. at ¶ 58.
- When a Sanofi sales representative asked at a national sales meeting in 2006 whether the Dr. Sedlacek's study could be discussed with prescribing physicians, if prescribing physicians raised concerns regarding permanent hair loss, the national sales team was instructed by Sanofi not to discuss Dr. Sedlacek's findings as they were not consistent with information contained in the label. *Id*. at ¶ 59.
- Sanofi's sales representatives detailing Dr. Sedlacek characterized his concerns about permanent hair loss associated with Taxotere as an "excuse" not to prescribe Taxotere. Sales management instructed the sales representative "don't back down" and "[d]on't let him [Sedlacek] off the hook!!!!!" *Id*. at ¶ 60.
- According to Sanofi's Global Safety Officer for Taxotere, Sanofi knew that Taxotere could cause permanent hair loss in 2006. Despite this, Sanofi created and published in 2006 an information brochure for oncology nurses that described alopecia as "a common, yet temporary, side effect of some cancer medicines" and provided no information regarding the risk of permanent alopecia associated with Taxotere. *Id*. at ¶ 140.
- Also, consistent with the Changes Being Effected regulations, Defendants had and continue to have a duty to initiate a change to the products' labels to reflect the true

- levels of risk, including the risk of developing Plaintiff's injuries complained of herein. To this day, Defendants have not adequately satisfied their duty to update the Taxotere labeling or prescribing information to reflect their knowledge as to the true risks of developing the injuries complained of herein.
- In addition, in 2010, Sanofi began proactively removing any comments about permanent alopecia from its Facebook page titled "Voices," which Sanofi sponsored for the alleged purpose of "mak[ing] Voices heard throughout the community on issues of importance to patients…" *Id*. at ¶ 141
- Sanofi began this practice after it observed posts from women about permanent alopecia following a March 5, 2010 article in the Globe and Mail, which described instances of permanent hair loss among Taxotere patients. In response, Sanofi's communications department formed a Rapid Response Team, and among its responsibilities included monitoring Sanofi's Voices Facebook page at all times to remove any posts about Taxotere and permanent hair loss. *Id*. at ¶ 142.
- Sanofi shortly thereafter hired an outside company, InTouch Solutions, to conduct this around-the-clock monitoring of its Facebook page. At Sanofi's direction, InTouch logged and removed posts about permanent hair loss, blocked the user posting about it, and reported the user to Facebook to have her banned from the platform. *Id*. at ¶ 143.
- For example, one Facebook user posted on Sanofi's page the following: "When will you inform oncologists that there is a problem with your chemo drug, Taxotere? Why don't you want women to know they could be left permanently disfigured? Because they will choose a different drug not made by you. The net is closing in on you, Sanofi." At Sanofi's direction, InTouch Solutions removed the post within an hour, blocked the user from posting on the page, and reported the user to Facebook. *Id*. at ¶ 144.
- Another user posted, "My medical team have spoken to you, and therefore I have been informed that YOUR DRUG Taxotere has done this to me. Why do you ignore me and REFUSE to contact me? Why don't you explain to me why your drug Taxotere has permanently disfigured me and hundreds of others?" InTouch Solutions removed the post within an hour and reported the user to Facebook. The same user posted 28 more times, and at Sanofi's direction, InTouch Solutions removed the post from Facebook and had the woman permanently banned from the page. *Id*. at ¶ 145.
- A different user posted "I did say I wouldn't stop until there was global publicity. You can't shut up women that you disfigure." Her post was removed by InTouch Solutions within an hour. *Id*. at ¶ 146.
- After successfully scrubbing mention of permanent hair loss from Sanofi's Voices Facebook page, InTouch Solutions created a presentation to market its services to other drug companies, and it used the "crisis management" services it provided to Sanofi as a case study of what it could accomplish for its clients. *Id*. at ¶ 147.
- As a result of Sanofi's fraudulent concealment of the association between Taxotere and Permanent Chemotherapy Induced Alopecia, the medical community and patients, including Plaintiff Karen Jackson, were deprived of adequate information about the drug. Consequently, Plaintiff was unaware of the connection between her use of Taxotere and her injury of permanent hair loss. *Id*. at ¶ 148.

5

As such, Plaintiff has properly plead in her proposed complaint that Defendants had a duty to report and adhere to the changes being affected criteria, knew that Taxotere causes permanent alopecia as early as 2006, but chose to conceal this information from Plaintiff and her healthcare provider by instructing sales representatives to suppress material information regarding the risk of permanent alopecia after treatment with Taxotere from Plaintiff and her healthcare providers in order to encourage and/or induce Plaintiff and her healthcare provider into selecting Taxotere over other alternatives treatments for breast cancer, intentionally scrub social media to prevent Plaintiff from learning the true cause of her hair loss, and as a result prevent Plaintiff from learning of the true cause of her permanent alopecia. Thus, Plaintiff's amendments are not futile and properly allege her fraudulent claims against Defendants.

## CONCLUSION

In sum, Sanofi knowingly and unapologetically exposed Plaintiff to a risk of permanent hair loss without her consent and at a point in time when she had choices as to chemotherapy cancer treatment for her highly survivable, early-stage breast cancer. The facts confirming its knowledge of the risk and internal concealment of the same until it's label change in December 2015 absolutely fit Florida's framework. Furthermore, leave should freely be granted, pursuant to Rule 15, for Plaintiff to amend her complaint as requested. Accordingly, Plaintiff respectfully requests that this Honorable Court overrule Defendant's opposition and grant Plaintiff's requested relief.

Dated: February 6, 2024             Respectfully submitted,

                                           */s/ Russell W. Lewis, IV*
                                           Russell W. Lewis, IV
                                           JOHNSON LAW GROUP
                                           2925 Richmond Ave. #1700

Houston, TX 77098 Telephone: 713-626-9336 Facsimile: 713-583-9460
Rlewis@johnsonlawgroup.com

*Counsel for Karen Jackson*

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Russell W. Lewis, IV*
Russell W. Lewis, IV
